# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 22-cr-00437-2 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| KIARA SANTANA ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Kiara Santana has been charged with arson and conspiracy to commit arson in violation of 18 U.S.C. §§ 844(i) and (n). She now moves to suppress statements she made about the alleged arson while law enforcement agents were executing a search warrant in her home, arguing, first, that the agents failed to provide the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and second, that she did not make the statements voluntarily. (Dkt. No. 43.) For the reasons stated below, the Court grants the motion.

## BACKGROUND

The Court held a three-day evidentiary hearing regarding Santana's motion to suppress. The Government called five witnesses. Four were agents with the Des Moines, Iowa field office of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"): Agents Kelly Etnier, Donald Dockendorff, Joseph Christensen, and Robert Carlson. The fifth witness, Officer Jason Schoenecker, was a detective with the Chicago Police Department who served as an ATF Task Force Officer. In addition to testifying on her own behalf, Santana called as witnesses her sister, Krystyna Santana,[1] and her mother, Tara Scharpenter. The parties also submitted many exhibits into evidence; the most notable for present purposes being a recording of the interview that took

---

[1] To avoid confusion, the Court refers to Santana's sister as "Krystyna" for the remainder of the opinion.

place during the search and pictures of the rear and indoors of the residence from the day of the search. What follows is the Court's summation of the evidence adduced during the hearing.

Agents with the Des Moines ATF office suspected Santana of purchasing guns that had been tied to crimes committed in Chicago. They therefore obtained a search warrant for Santana's residence, a small duplex in Boone, Iowa, where Santana lived with her sister and her three young children. At 6:00 A.M. on May 6, 2021, approximately eight agents dressed in tactical gear lined up by Santana's backdoor with their weapons drawn. Some of the agents carried long rifles, others carried handguns, and at least one carried a ballistic shield. The agents knocked and announced their presence multiple times. After noticing no response, the supervising agent, Agent Dockendorff, gave the order to breach the door with a battering ram.

Inside, Santana and Krystyna had been sleeping on the couch in the living room. Santana was twenty-three years old at the time; Krystyna was seventeen. Santana's three-year-old daughter, Jolena, was asleep upstairs. Her other children were not in the residence that morning. Santana and Krystyna awoke to the knocking and were approaching the door just as agents burst in, ripping off the door's trim in the process. Santana testified that she grabbed Krystyna and directed her to get on the ground.[2] She told the agents Jolena was upstairs. Santana recalled that, once the agents retrieved Jolena, the three of them stepped outside while the agents cleared the residence. The agents, in contrast, testified that the three residents stayed in the kitchen. Either way, the sweep took several minutes. Santana, Krystyna, and Jolena congregated in the kitchen afterwards.

---

[2] Krystyna testified that she, Santana, and Jolena were all on the ground together, adding that agents were training "big guns" at them and that they only got up when the agents said they could. Santana's testimony is not clear as to whether she ever got on the ground herself. She also suggested that Jolena was never on the ground. On that note, Agent Christensen (one of the first agents to enter the house) and Agent Carlson testified that they never saw *any* of the residents on the ground.

After completing their sweep of the residence, the agents changed into more comfortable clothing, though it still identified them as ATF employees. They also stowed away their assault rifles but not their handguns, which they holstered. When the agents reentered the residence to conduct the search, three other members of law enforcement joined them: one local police officer; one agent from the Chicago ATF field office; and Officer Schoenecker. The latter two had come only to speak with Santana about an arson and homicide that occurred in Chicago. They did not participate in the initial entry or the execution of the search warrant.

Agent Etnier was the case agent for the gun-crimes investigation, and he likewise planned to interview Santana while his colleagues searched the residence. When Etnier asked Santana if she was interested in talking, she agreed so she could learn more about why the agents were there. Santana and a group of law enforcement officers made their way to the living room just down the hall from the kitchen. Krystyna and Jolena remained in the kitchen, as did Agent Carlson, who had situated himself at the kitchen table to inventory evidence recovered during the search.

When the interview began,[3] Santana sat on the couch with Etnier directly across from her on an ottoman. At least three other members of law enforcement were standing in the room too, including Schoenecker. A couple minutes into the interview, Santana asked for a female agent to join them because she felt uncomfortable; the agents obliged. The living room was quite small,

---

[3] It is unclear how much time passed between the agents' initial entry into the residence and the start of the interview. Etnier had a recorder with him, but he testified that he mistakenly did not record the first fifteen minutes or so of the interview. The recording is one hour and eight minutes long, which aligns with other witness' recollections of the interview lasting about ninety minutes. The recording ends with Etnier identifying the time as 8:26 A.M, suggesting the interview began sometime around 7:00 A.M. But Etnier testified that he would not have been in the residence for an entire hour before speaking with Santana. And Santana similarly testified that she was in the kitchen for just a few minutes before the interview started.

but Etnier testified that Sanatana had unimpeded access to the front and rear doors. In addition, Etnier told Santana that she did not need to speak with him, that she was not under arrest, and that she was free to leave—instructions repeated at various points throughout the interview. Santana also concedes that the agents did not handcuff or physically assault her. None of the agents gave Santana *Miranda* warnings.

Although the conversation began with an explanation of the search warrant, Etnier soon shifted to asking about Santana's role in purchasing the guns he was investigating. The recording indicates that other agents in the room interjected with their own questions along the same lines. This portion of the conversation took around thirty minutes according to Etnier, and Santana can be heard getting more and more upset as agents continued to pressure her. For example, agents suggested that Santana's denials would not play well in court and that she could face prosecution for her admitted marijuana use. Santana eventually made incriminating statements. At roughly twenty-four minutes into the recording, Santana asked to go to the bathroom so she could vomit. The female agent escorted her. When Santana returned, Schoenecker started questioning her about the arson in Chicago and a related homicide. Santana was obviously still distraught; before long, she made incriminating statements with respect to that investigation as well. Etnier and Schoenecker assured her that they would try to help her if she continued to cooperate.

For most of the interview, Santana was separated from Krystyna and Jolena, who generally stayed in the kitchen. Whereas Krystyna testified that the agents would not let her join Santana, Carlson did not remember any such restriction. Certainly, Carlson insisted, he would not have prevented Jolena from interacting with Sanatana. And, indeed, Jolena can be heard entering the living room at a couple points in the recording. She also sounds like she is laughing

4

in select clips, which tracks Carlson's and Dockendorff's descriptions of her excited, playful demeanor. But Krystyna testified that Jolena was mostly upset and crying during the search.

In addition, Santana was without her car keys throughout the interview. Agents were searching her car, and Etnier did not remember anyone ever coming back to return her keys or tell her they were done. Nor did Santana have her cell phone; agents had seized that too, along with Krystyna's phone, and placed it in a plastic bag. Nonetheless, agents did retrieve the number of a lawyer from Santana's phone at her request. Further, when Santana's mother, Scharpenter—who Krystyna had messaged using her school laptop—called Santana's phone to see what was happening, agents allowed Santana to answer and request that Scharpenter drive over.

Scharpenter arrived at about 8:30 A.M., the same time agents were wrapping up the search and the interview. Santana, Krystyna, and Jolena left the residence shortly afterwards.

## DISCUSSION

Santana asks the Court to suppress the statements about the arson that she made during the May 6, 2021 interview. Her primary argument is that she never received *Miranda* warnings, which prophylactically protect an individual's right against self-incrimination. *United States v. Leal*, 1 F.4th 545, 549 (7th Cir. 2021). *Miranda* only applies to custodial interrogations. *United States v. Cox*, 54 F.4th 502, 511 (7th Cir. 2022), *reh'g denied*, No. 21-1744, 2023 WL 362518 (7th Cir. Jan. 23, 2023), *and cert. denied*, No. 23-5063, 2023 WL 6378656 (U.S. Oct. 2, 2023). Here, the Government does not dispute that the interview constituted an interrogation; the parties' dispute concerns whether Santana was in custody.

The custodial inquiry is an objective one. *Id.* In short, it asks whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."

*Leal*, 1 F.4th at 549 (alteration in original) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).

Courts consider the totality of the circumstances surrounding the interrogation, such as:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) (internal quotation marks omitted). "[T]he focus is 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Lentz v. Kennedy*, 967 F.3d 675, 689 (7th Cir. 2020) (quoting *Howes*, 565 U.S. at 509).

The totality of the circumstances in this case indicate that Santana was in custody when she made the incriminating statements. Indeed, her introduction to the agents immediately set the tone for the interrogation. Santana woke up to nearly ten agents bursting into her duplex with a significant "display of force," wearing tactical gear, wielding guns, and shattering the trim of the door. *United States v. Borostowski*, 775 F.3d 851, 860 (7th Cir. 2014). Agents then took over the space, which everyone agrees was cramped to start. *See Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) (emphasizing in a habeas case "the degree to which the police dominated the scene"). Although members of law enforcement spread throughout the entire residence, their presence was most domineering in the living room, where approximately four agents and officers crowded around Santana on the couch and peppered her with questions. Such "overwhelming armed force in the small [duplex] could not have failed to intimidate the occupants." *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010).

Further, the agents restricted Santana's movement while they were in the residence. Santana, Krystyna, and Jolena were directed to either the kitchen or the backyard (recollections

6

vary) during the protective sweep. That minimal restraint, by itself, likely would not contribute much to a sense of custody. *United States v. Valley*, 755 F.3d 581, 585–86 (7th Cir. 2014). But even after the sweep, the three could not move freely about their own home. Most notably, an agent escorted Santana to the bathroom when she had to throw up due to the stress of the questioning. *See Borostowski*, 775 F.3d at 861 (concluding the defendant was in custody in part because he "was not allowed to leave the bedroom and walk through his own home unaccompanied but was followed to the nearby bathroom and had to ask for shoes and a jacket"). Along those lines, agents directed Santana into the living room and away from her family before starting the interrogation. *See id.* (adding that the defendant "was forcefully separated from family members"). According to the Government's witnesses, this separation was not physically enforced, particularly with respect to Jolena. But even accepting that as true, it is clear the agents created an environment where Santana was on her own and likely to remain that way for the bulk of the interrogation.

What is more, Santana did not have reasonable means to escape law enforcement. The interrogation appears to have started sometime around 7:00 A.M.; with two minors under her care (one of them only three years old), no phone, and no car, Santana was effectively stuck in her duplex—the same, small space where agents were conducting an extensive search. And without anywhere to go, a reasonable person would not "have felt free to end the encounter and leave." *Id.* at 863.

The course of the questioning would only have heightened a reasonable person's sense that she was in custody. Before making the incriminating statements in question, Santana partially confessed to the crime Etnier was investigating. From that point onward, the agents essentially "had the goods on" her. *Slaight*, 620 F.3d at 820. A reasonable person would have

7

been hard-pressed to end the conversation once Schoenecker, who had come all the way from Chicago with a colleague from Chicago's ATF field office, began asking about the arson. *Cf. Missouri v. Seibert*, 542 U.S. 600, 613 (2004) ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.").

To be sure, some of the attendant circumstances weigh against a finding of custody. For example, Santana was not handcuffed or otherwise compelled to talk through physical force, the interrogation was relatively short, and the agents allowed Santana to leave after promising her they would. *Cox*, 54 F.4th at 511. The interrogation also occurred in the familiar setting of her living room as opposed to a police station. *Id. But see Sprosty*, 79 F.3d at 641 (prioritizing the extent of police control over "the familiarity of the surroundings"). Nonetheless, these factors do not overcome the totality of the circumstances discussed above.

One final note: The parties give much attention to the propriety of executing the search warrant at 6:00 A.M. The Court does not weigh in on that issue. In fact, there may well be legitimate reasons for law enforcement to execute a warrant as early as possible. *See Slaight*, 620 F.3d at 820 ("We are not disposed to question the safety measures that police employ when entering a house to serve a search warrant."). But that law enforcement officers are executing a search warrant does not give them *carte blanche* to begin interrogating residents without providing *Miranda* warnings. *Id.* In other words, that law enforcement officers have a valid reason for being in a suspect's home does not mean their presence cannot contribute to a reasonable person's sense of being in custody—as it did here.

## CONCLUSION

For these reasons, the Court grants Sanatana's motion to suppress. Santana was in custody when she made the incriminating statements about the arson. As there is no dispute that the interview amounted to an interrogation and that Santana never received *Miranda* warnings, her statements must be suppressed.[4]

ENTERED:

Dated: April 12, 2024

_____
Andrea R. Wood
United States District Judge

---

[4] This conclusion is dispositive, so the Court need not further address whether Santana made the statements voluntarily. To the extent Santana intended to raise an argument concerning her Sixth Amendment right to counsel as well (the motion is unclear), the Court need not reach that issue either.